## CHRYSLER CREDIT CORPORATION v. PALMIERI, et ux.

No. 213515.

Small Claims Court, Dade County.

November 25, 1970.

Paul E. Gifford and William A. Ingraham, Jr., both of Miami, for the plaintiff.

Eugene J. Howard, Miami, for the defendants.

MORTON L. PERRY, Judge.

*Final judgment:* This cause came on for trial on September 14, 1970 on plaintiff's claim for a judgment for deficiency in the amount of $648.99 resulting from the execution of an automobile retail installment contract by defendants in connection with their purchase of an automobile from Spitzer Motors of Miami, Inc.

Plaintiff introduced into evidence a retail installment contract for the sale of a new 1968 two-door sport hardtop, eight cylinder, air conditioned Dodge Charger entered into between the defendants and Spitzer Motors on May 3, 1968. The contract reflected a cash sales price of $4,601 to be paid by the defendants who gave as their down payment a 1967 Chevrolet Belaire station wagon which had a net trade-in value of $1,509.52, plus an additional cash down payment of $50.

The defendants agreed to pay a time balance of $3,609.36 over a 36 month period commencing July 7, 1968. The sum of $608.19 of the time balance represented finance charges and a charge for credit life insurance.

The plaintiff's claim for a deficiency judgment in the amount of $648.99 was arrived at after adding plaintiff's costs of repossession in the amount of $354.36 to the balance then claimed due under the contract and deducting therefrom the sale price of $1,635 obtained by the plaintiff upon sale of the car to All American Motors and other credits for unearned premiums and interest.

The defendant, Julio Palmieri, testified that the car, which he and his wife owned, was stolen on September 22, 1969 — dates hereinafter mentioned are all in 1969 — from his place of employment together with his bowling ball, bag and shoes which were kept therein. This defendant further testified that shortly prior to the time of the theft he had made a payment on his installment contract. He testified that he had made continuous monthly payments upon this contract but that his payments were not made on the same date, but within the monthly period that they became due.

He testified that upon learning of the theft on the afternoon of September 22d, he immediately notified his automobile insurance carrier, Car City Insurance Company, which insured the defendants against theft of their automobile. He stated that he had previously carried similar comprehensive insurance coverage providing for theft with another carrier but testified that he had been induced by the plaintiff to switch to Car City Insurance when his premium payment became due. Car City Insurance Company is a wholly-owned subsidiary of the plaintiff corporation. The defend-

ant's testimony relating to the events which ensued following his reporting of the theft to Car City Insurance Company follows —

He testified that he telephoned Car City Insurance Company immediately following the theft on or about September 22d and almost daily thereafter, that he advised Car City's representative of his need for the use of an automobile and that he called the company frequently in his attempts to obtain the use of a car. He stated that he engaged in discussion regarding his insurance claim with a "Mr. Russell" who he understood represented Car City Insurance Company and who appeared to be handling his insurance claim.

He stated that on October 7th he was advised by the same "Mr. Russell" that he had defaulted on the making of a monthly payment slightly over one year prior thereto, saying that it was at that moment that he was shocked and surprised to learn, for the first time, that the plaintiff's place of business and Car City Insurance Company were apparently one and the same and that both businesses had the same telephone number. He further discovered that "Mr. Russell" had attempted to act for both Car City Insurance Company and the plaintiff in his dealings with the defendants.

He stated that Russell demanded payment of $2,300 which Russell said was due as a result of defendants' failure to make a monthly payment approximately 14 months prior thereto. He said he advised Russell that he did not have $2,300 to cure the "default" which had occurred over a year prior thereto and which had been declared to the defendant Palmieri for the first time by telephone and only after the defendants had made and plaintiff had accepted approximately thirteen subsequent installment payments. The evidence failed to show either written or oral notice of such "default" until after defendants' claim against plaintiff's subsidiary company arose.

He further testified that he received no benefits from Car City Insurance Company regarding his claim for car rental or other expenses incident to the theft nor did he receive further advice from the plaintiff of any kind until a notice of sale of his automobile was mailed to him on October 27th.

The evidence showed that the defendants had title to the automobile and that the plaintiff had a lien thereon, and that the insurance policy reflected therein the dual interest of the parties hereto.

The evidence disclosed that on October 8th the plaintiff received word from New York City that the defendants' stolen automobile had been found in New York City, further that in spite of having

been made aware of the fact that it had been located, neither the plaintiff nor the insurance company advised the defendants, as title holders, that it had been located. Instead, the plaintiff arranged on a unilateral basis for the return of the car to Miami — without consulting with or giving notice to the defendants.

The plaintiff obtained the services of one L. C. Butler who was paid $120.09 for the purpose of driving the car to Miami. An indication of the brazen disregard held by the plaintiff for the rights of the defendants is suggested by plaintiff's demand for a $40 gratuity paid to Butler by plaintiff and now sought from defendants as a part of its "expenses" upon which a part of their deficiency claim is founded.

Plaintiff's witness testified that a charge of $88.50 plus other charges aggregating $58.25 was paid to Bob Hersh Chrysler of New York City for the storage of said atuomobile at the rate of $1.50 per day. It would appear from the testimony of the plaintiff's witness that such storage charges covered a 59 day period. It would further appear from a copy of a Notice of Sale dated October 24th signed by a Mr. Guy E. Russell as collection supervisor on behalf of the plaintiff corporation, that the defendants were afforded opportunity to redeem their automobile at any time before November 3d when it was scheduled to be offered for private sale by the plaintiff.

It would thus appear that the automobile was available to the defendants in Miami for possible redemption from October 24th to the projected November 3d sale date. It would further appear that the storage charge covering a 59 day period assessed against the defendants by the plaintiff for storage charges by the Bob Hersh Chrysler Agency in New York City would have required the car to have been held in storage by the New York automobile dealer for a period of not less than 59 days prior to October 24th, namely, August 25th.

The defendant, Palmieri, testified specifically that his automobile was not stolen until September 22d — while the plaintiff's witness testified that the car was stolen in either August or September, 1969. The defendant is obviously better qualified to determine the exact date of the theft of his automobile. It would thus strongly appear that the plaintiff is attempting to claim from the defendants monies for storage expenses for a part of August and early September of 1969. Yet it is clear from Palmieri's testimony that the theft did not occur until September 22d.

The court would note that plaintiff claimed $35 from defendants for "ignition expense" plus $6.25 for other parts which plaintiff

claimed to have paid Bob Hersh Chrysler after the stolen car was retrieved. In this regard, although the defendant, Palmieri, made it manifestly clear that he had received no benefits under said policy, the evidence shows the car to have been stolen and that such charges for retrieving the automobile, storage and "ignition expenses" related directly to such theft.

These circumstances suggest question as to why such expenses of theft were not paid to either the plaintiff or the defendants under the policy of insurance which was in effect and in which policy the parties had a dual interest. The evidence, unfortunately, failed to spell out the reason that plaintiff now sues the defendants and did not recover such expenses from its carrier under the policy of insurance.

The plaintiff's witness described to the court the method whereby the car was sold in pursuance of the aforenoted Notice of Sale. Plaintiff's witness testified that he contacted three local automobile dealers by telephone and described the car to them on the telephone stating that it was in fair condition. He thereupon received telephone bids from Courtesy Ford for $1,500; Spitzer Motors of Miami for $1,600; and All American Motors for $1,635. The evidence showed that All American Motors purchased the automobile for $1,635.

The plaintiff sued for a deficiency judgment under the Uniform Commercial Code and sold defendants' automobile at private sale.

Florida Statute 679.9-504 (3) requires, as regards such sale that ". . . every aspect of the disposition including the method, manner, time, place and terms must be 'commercially reasonable'".

This statute contemplates that "private sale through commercial channels" will result in higher realization on collateral for the benefit of all parties.

The court would note that in December, 1969, approximately one month after the private sale, an eight cylinder, two-door Dodge hardtop Charger, with air conditioning, carried an average retail value of $2,395 and an average wholesale value of $2,000 according to the December, 1969 N.A.D.A. Official Used Car Guide. The court presented this information to the parties during the trial by obtaining the 1969 N.A.D.A. Official Used Car Guide and reading the aforenoted pertinent information to the parties. The N.A.D.A. book value of a repossessed automobile was held to be admissible evidence in O'Brien v. GMAC, 362 P.2d 455 (Wyoming, 1961).

The court would observe that one of the telephone bids obtained by the plaintiff of $1,600 is in an amount in excess of one-third less than the retail price listed by the Official Used Car Guide and over two-thirds less than the purchase price of $4,600 paid less than 18 months prior thereto by the defendant for his automobile.

The court would note further that Professor William Hogan of the University of Minnesota Law School commented in the *Uniform Commercial Code Law Journal,* vol. 2, 1969, at page 255, as follows —

> "When you are foreclosing on a dealer's inventory, it would be perfectly proper to realize on the collateral in a wholesale fashion. * * *
>
> "Yet, when there is a retail debt, you should not deprive the debtor of the benefit of the retail market."

It is apparent to the court that the actual private sale price of the car was not only arbitrarily achieved by what would appear to be an attempted wholesale sale which was over 20% less than the wholesale price then established by N.A.D.A. Official Used Car Guide, but also, that the sale price of $1,635 was $760 less than the then listed average retail value of the car. This differential is nearly one-half of the actual price realized by the plaintiff.

The court would take serious issue with the method and manner of sale which the court finds to be inadequate to meet the statutory test of being commercially reasonable.

There is no evidence of even the first advertisement having been placed either to the general public or to the automobile trade in general.

The plaintiff, by its testimony, selected three dealers of its own choosing to obtain telephone bids in connection with the sale. The plaintiff's witness testified that the "high bidder" then inspected the car, which was kept at the rear of plaintiff's premises, for the first time, and proceeded to pay for it. The two other "bidders" never laid eyes on the automobile.

The court would observe that the obligation secured by plaintiff is a retail debt and there is a contention, as aforenoted in the *Uniform Commercial Code Law Journal,* that "when there is a retail debt, you should not deprive the debtor of the benefit of the retail market".

The plaintiff has failed to show that the manner and method of sale availed the defendants of either the retail or the wholesale market as regards the sale of their automobile.

The subject of a commercially reasonable sale is treated in vol. 22, no. 1, of the *Stanford Law Review* (November, 1969) by Professor Philip Shuchman, who stated —

> "Focusing upon the function of commercial reasonableness, and not upon the institution that may perform that function, the used car lot and the retail price standard seem to be essential requirements of a commercially reasonable post-repossession sale."

The court finds considerable merit in the professor's reasoning. The court further finds, for the reasons herein noted, that the plaintiff failed to meet the test of commercial reasonableness required under the statute as regards the sale of defendants' repossessed automobile.

The circumstances surrounding this matter have been a source of considerable concern to this court. The court is keenly aware that suits for deficiency judgments in connection with automobile retail installment contracts are not an uncommon occurrence in this court, where a considerable number of such cases result in default judgments when the defendant fails to appear and defend. The defendant is thus not heard and his possible defenses are never brought to the court's attention, but rather a deficiency judgment is entered against him by default in the amount claimed by the plaintiff.

Simple calculation indicates that in the present case, the defendant's use of his automobile for 16 months had already cost him over $3,000 considering the net trade-in value of his 1967 station wagon of $1,659 plus 14 monthly payments in the amount of $100.26 per month.

Plaintiff contends that under the terms of the contract and by virtue of the terms of the Uniform Commercial Code the defendants are obligated to pay plaintiff an additional $648.99 plus court costs plus plaintiff's attorneys fees in its suit for a deficiency judgment.

The purchase of an automobile is usually a major concern in the life of the average citizen. The expenditure of a sum in excess of $3,000 and the defendants' subsequent loss of their investment as aforenoted is of itself difficult for the typical car purchaser to absorb. When such a loss may be increased to close to $4,000 by the court's granting of a deficiency judgment, the financial plight of the purchaser is made more severe — particularly when the automobile upon which the deficiency judgment was claimed has long past been disposed of by the plaintiff.

The evidence presented before the court in support of plaintiff's claim for default is disconcerting and suggests that the plaintiff has treated defendants with a callous disregard in their business relationship.

The action of Russell in switching hats from that of the defendants' "insurance claim representative" to that of plaintiff's collection agent in the course of a telephone call made by defendant to his insurance carrier while attempting to pursue his claim resulting from the theft of his automobile was at the least highly unusual.

However, Russell's oral declaration to the defendant Palmieri that he was in default under his installment contract and that he was required to pay the full sum of $2,300 to cure this claimed default was high-handed in the light of the following —

First, the plaintiff had not given the defendants either oral or written notice of such default either at the time of same or during a period in excess of one year during which time the defendants had made and the plaintiff had accepted monthly installment payments as aforenoted.

Second, the evidence showed that the insurance carrier was a wholly-owned subsidiary of the plaintiff and that the carrier and finance company shared the same telephone number and, at least in this instance, the services of Russell.

Third, the oral declaration of default came only after the defendant had claimed use of a rental car under his policy of insurance which was financed by the plaintiff after defendants had switched from another insurance carrier at the urging of the plaintiff. There is little question in the court's mind that the said default resulted from defendant's asserting his insurance claim as aforenoted.

The court would reiterate that not only did the plaintiff fail to give written notice of default at any time in the herein proceedings, but also that the plaintiff failed to notify the defendants that their automobile had been recovered in New York after the plaintiff had been advised of such recovery on October 8th.

Instead, the evidence showed that the plaintiff proceeded to cause the same to be returned to Miami and the plaintiff displayed a remarkable open-handedness in tipping the driver an additional $40 which plaintiff now seeks to recover from the defendants.

The court has already raised questions regarding payment of automobile storage, recovery and repair expenses under the policy now claimed by the plaintiff, but the court will refrain from conjecture regarding failure of the insurance company to make such

payment in that the policy of insurance was not introduced into evidence during the trial nor were the circumstances surrounding such claim developed by the parties.

The court has found the sale of the defendants' automobile to be commercially unreasonable and would observe. in this regard that certain legislative guidelines relating to post-repossession sales are necessary. Consideration should be given to, and competent authority does recommend, the establishment of the wholesale value as a minimum sale price.

Judgment is entered in favor of the defendants.